OLD COLONY LIFE INSURANCE COMPANY *v.* JULIAN.

Opinion delivered November 7, 1927.

1. INSURANCE—FRAUDULENT CONCEALMENT OF PHYSICAL CONDITION.— Where a life insurance company sought to cancel the insured's policy on the ground of his fraudulent concealment from the medical examiner of his past physical condition, evidence *held* not to show such fraudulent concealment.

2. INSURANCE—CANCELLATION OF POLICY—BURDEN OF PROOF.—In a suit by a life insurance company to cancel a policy on the ground of fraudulent concealment of insured's' previous physical condition, the burden was on the insurance company to establish affirmatively the falsity, materiality, and bad faith in the representations made by the insured in the application; the policy containing a statement that, in the absence of fraud, the statements in the application were deemed representations and not warranties.

3. INSURANCE—KNOWLEDGE OF MEDICAL EXAMINER.—Where, in a suit by a life insurance company to cancel a policy on the ground of fraud of insured in making statements to the medical examiner relative to the condition of his health a few years previous to the examination, it was shown that the medical examiner knew of the condition of insured's health at the time in question, *held* that the knowledge of the medical examiner was the knowledge of the company, and precluded cancellation on the ground of fraud practiced through such statements.

4. INSURANCE—INSANITY WITHIN DISABILITY PROVISION.—Under a policy providing for payments by reason of a total and permanent disability of the insured due to bodily injuries or disease, insured is entitled to recover where it is shown that he became totally and permanently disabled by reason of insanity such as to prevent him from being intrusted with any responsibility.

5. INSURANCE—NOTICE OF DISABILITY.—The requirement in a policy that notice should be given of a total and permanent disability,

*held* that insanity operated to excuse the insured from giving the required notice.

6. INSURANCE—SUFFICIENCY OF NOTICE OF DISABILITY.—Where, under a policy requiring notice of disability, the insured's sister wrote a letter to the company regarding the condition of her brother, inclosing a statement from physicians showing his condition, this was sufficient notice of his disability where the company had not advised that it required a particular form of proof of loss.

7. INSURANCE—RIGHT TO RECOVER ATTORNEY'S FEES.—Where, in a suit brought by a life insurance company to cancel insured's policy, the defendant by counterclaim recovered for disability from insanity, *held* that the provision of Crawford & Moses' Dig., § 6155, permitting one recovering against an insurance company to recover attorney's fees, was applicable to such case.

8. INSURANCE—AMOUNT OF ATTORNEY'S FEES.—Where, in an action by a life insurance company to cancel the policy of insurance, the insured by a counterclaim was awarded $200 under the disability provisions of the policy, and in addition thereto was awarded $250 as attorney's fees, *held* that such attorney's fees were not excessive, since, as the insured's disability was of a permanent nature, the ultimate amount involved in such suit exceeded the $200 rendered.

Appeal from Craighead Chancery Court, Western District; *J. M. Futrell,* Chancellor; affirmed.

*McKinley & Price* and *Gautney & Dudley,* for appellant.

*Basil Baker,* for appellee.

McHANEY, J.   On February 16, 1923, appellee, Orby Julian, made application to appellant for a policy of life insurance, in which his mother, the appellee, Annie Julian, was to be named as beneficiary.   The application consists of two parts:   Part 1, being the questions and answers made at the time the agents, Webb and Neustadter, took his application; and part 2, being the questions and answers thereto given to the medical examiner, which is dated February 20, 1923.   Under date of February 28, 1923, the medical examiner, who had filled out part 2 of the application, made a confidential report to the company, in which he answered all the questions called for in the confidential report, in which he stated that no other person was present at the examination except him-

self and the applicant. Also in this confidential report he stated that the age of the applicant as given by him was 28, but that his apparent age was 25, and stated that he had the general appearance of a healthy person, of normal gait, without defects or deformities, without impairment of sight or hearing, or disease of skin, bones or joints. Question 31 in this report is as follows: "Q. Do you see in the appearance, manner, occupation, residence, mode or station of life of the person examined, anything which would render him in any way undesirable as a risk, or make the proposal of insurance one of speculation or over-insurance?" His answer to that question was "No." In part 2 of the application, consisting of answers made to the medical examiner, the applicant was asked if he had had any of the list of ailments therein stated, running through the alphabet from albumin in the urine to varicose veins, and consisting of about sixty-five diseases, influenza not being one of the diseases called for, and he answered "None." Question 22 of said part 2 is as follows: "Name all ailments, physical injuries and surgical operations said person has had in the last ten years, giving the names of all persons who attended said person in connection therewith, together with date and address." He answered "None." As a matter of fact this answer was untrue, for, in the year 1918, he had had a serious case of influenza, and had been treated by two physicians in Jonesboro. This fact is undisputed.

It appeared in evidence, on a trial of the case, that appellee, Annie Julian, and her son, C. L. Julian, who is a brother of appellee, Orby Julian, were both present at the time part 2 of the application was filled out by the examining physician, Dr. Hartwig, who himself admitted that the mother was present, but did not remember the brother being present, although he had stated in his confidential report that no other person was present. Both the mother and her son, C. L., testified that the examining physician was told, in answer to question 22, as above set out, regarding the serious case of influenza the appli-

cant, Orby Julian, had had in 1918, but that he stated it was not necessary to mention same in answer to said question, for the reason that it was not included in the list of diseases above mentioned, set out under question 20.

It was also provided, in part 1 of the application, that the applicant agreed that there should be no contract unless the policy was delivered to and accepted by the applicant while in good health, and it is further set out therein that "all statements and answers written in this application, marked part 1, as well as those made and to be made to the medical examiner in continuation hereof, marked part 2, are true and complete; that no material information or facts have been omitted therefrom, and that the same are offered to the company as a consideration for said insurance and any other or additional insurance for which policies may be issued by the company on this application." The application, medical examination and confidential report were thereafter mailed to the insurance company, on which it issued two policies for $1,000 each, both dated March 13, 1923, and both were delivered to the insured June 11, 1923.

The policies contained the following provisions:

"Waiver of Premiums. The company will waive the payment of all premiums becoming due hereon after expiration of six months from the date of receipt by the company of satisfactory proof that the insured has become totally and permanently disabled, as hereinafter defined, if such proof is received before the insured has attained the age of sixty years and if all premiums becoming due hereon from the beginning of this insurance to the expiration of the aforesaid six months have been duly paid. The payment so waived by the company will not be charged as an indebtedness against the insured or this policy, which will continue in full force towards maturity, with loan, cash and other guaranteed values increasing and progressing from year to year, in like manner as if the premiums were being duly and regularly paid by the insured.

"Disability Annuity. If such proof is received by the company before the insured has attained the aforesaid age and premium payments have been waived as herein provided, the company will, one year after the receipt of such proof, begin to pay the insured a disability annuity of one-tenth of the face amount hereof, and will make such annuity payments annually on the anniversary of the first payment until the maturity of the policy, without charging any such payments as an indebtedness against the insured or this policy.

"Miscellaneous Conditions. The total and permanent disability of the insured herein referred to must be due to bodily injuries or disease occurring while this policy and this provision are in full force, and must be such as to prevent the insured then and at all times thereafter from performing any work or conducting any business for compensation or profit; provided that, notwithstanding proof of disability may have been accepted by the company as satisfactory, the company shall, at any time, on demand, be furnished satisfactory proof of the continuance of such disability; and if such proof is not furnished, or if it shall appear to the company that the insured is able to perform any work or to conduct any business for compensation or profit, no further premium payments shall be waived nor annuity payments made. In no event will premium payments be waived, or annuity payments made, except during total and permanent disability of the insured, as herein provided. Military or naval service in time of war is a risk not assumed by the company under any of the foregoing disability provisions."

In the latter part of June, or the early part of July, 1923, Orby Julian, the insured, became insane. Appellant's agents were notified of this condition, and, on March 19, 1924, Mrs. Pearl Turner, sister of the insured, wrote a letter to the appellant, inclosing a statement from the physician, regarding the condition of her brother; and again, on June 3, she communicated with appellant

relative thereto, but received no reply to either of these letters.

On September 24, 1924, appellant filed suit in the Craighead Chancery Court, Western District, in which it sought to cancel the policies in question, on the ground that the insured had fraudulently concealed material facts from the company in the answers to the questions in the application heretofore referred to, and in accepting delivery of the policies at a time when he was not in good health. Appellees filed an answer, in which they denied the allegations of the complaint, and a cross-complaint seeking a recovery, under the disability annuity provision of the policy, of one-tenth of the face amount thereof, $100 on each policy, together with penalty and attorney's fees. On a trial of the case the court dismissed the complaint of the plaintiff for want of equity, rendered judgment against it on the cross-complaint for $200, $24 penalty and a $250 attorney's fee, from which comes this appeal.

It is first contended, for a reversal of this case, that the insured fraudulently concealed from the medical examiner his illness in 1918. We do not think the preponderance of the evidence supports appellant's contention in this regard. On the other hand, we think a decided preponderance of the evidence shows that the medical examiner was advised of the illness of 1918, and made the statement to them that it was not necessary to report it in part 2 of the application, as it was not one of the diseases listed. This fact was positively testified to by the insured's mother and brother, and the medical examiner himself, when asked regarding this statement, first testified that he did not remember. While he later denied this conversation, still we think his manner of testifying on this point leaves their statement about this occurrence practically undenied. But, even though it be admitted that no such conversation took place, and that he neglected to tell the medical examiner regarding his illness in 1918, still it does not necessarily follow that it was fraudulently done, for, at

the time of the examination and the answer to the question, according to the medical examiner's own confidential report and other evidence, he was a man in fine physical condition and a good insurable risk, without any apparent disease, either of body or mind, and appeared to be younger than he actually was. Therefore, whatever impairment of his health there might have been by the attack of influenza in 1918, he had apparently fully recovered therefrom in 1923, when he was examined for this insurance, and there is no substantial evidence in the record connecting the disease from which he now suffers with the attack of influenza in 1918. The burden is upon appellant to establish the fraud by proving affirmatively the falsity, materiality and bad faith in the representations made by the insured in the application regarding his health. Moreover, the policy provides that "all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall avoid this policy, or be used in defense of a claim hereunder, unless it is contained in said written application." In the recent case of *Bankers' Reserve Life Co.* v. *Crowley,* 171 Ark. 135, 284 S. W. 4, this court said:

"It is expressly agreed that the answers of the applicant copied above are representations and not warranties. In this connection it may be stated that a non-compliance with a warranty operates as an express breach of the contract of insurance, while false representations render the policy void on the ground of fraud. The questions propounded in the application as set out above call for answers founded on the knowledge or belief of the applicant, and a misrepresentation or omission will not avoid the policy unless willfully or knowingly made with an intent to deceive. *Metropolitan Life Ins. Co.* v. *Johnson,* 105 Ark. 101, 150 S. W. 393. In *Mutual Aid Union* v. *Blacknall,* 129 Ark. 450, 196 S. W. 792, it was held that knowledge affecting the rights of the insured, which comes to the agent of the insurance company while he is performing the duties of his agency

in receiving applications for insurance and delivering policies, becomes the knowledge of the company; and the insurance company is bound thereby, where the agent who solicited the business was charged with the duty of asking the applicant questions concerning his physical condition.''

Hence, in this case, the knowledge of the medical examiner was the knowledge of the company, and the policy cannot be canceled on this account.

It is next contended that the disability of the insured does not come within the terms of the policy, and it is urged that the uncontradicted evidence shows that the insured's physical condition is as good now as it ever was. The disability referred to in the policy is defined under miscellaneous conditions to be ''the total and permanent disability of the insured herein referred to must be due to bodily injuries or disease, * * * such as to prevent the insured then and at all times thereafter from performing any work or conducting any business for compensation or profit.'' While it is true that he is strong physically, it is also shown that he is totally and permanently disabled by reason of insanity that amounts almost to imbecility, such as to prevent him from being intrusted with any responsibility. We therefore hold that he is totally disabled within the meaning of the policy, and that there is no substantial evidence in the record tending to show that this disability has any connection with the case of influenza he had in 1918.

It is next urged that the court erred in holding that there was any proof of disability, or that the company had waived such proof. Let it be remembered that the insured in this case became totally and permanently insane shortly after the delivery of the policies. In the recent case of *Pfeiffer* v. *Mo. State Life Ins. Co.,* 174 Ark. 783, 297 S. W. 847, we said:

''The clause of the policy with respect to giving notice of permanent disability of the insured is a condition subsequent, and, as we have already seen, should be construed liberally in favor of the beneficiary. The

condition of the policy in respect to giving notice of permanent disability as well as making proof of death operates upon the contract subsequent to the fact of loss. The insured has done all that he can do towards carrying out his part of the contract, and the liability of the company under the terms of the policy has attached. Nothing remains to be done except to give the company notice of its liability and make proof thereof. If the insured has become permanently insane at the time the permanent disability attaches, it is evident that he is in no condition of mind to give the notice or make proof of his disability. Hence, if the policy in such case is to receive a liberal and reasonable construction in favor of the beneficiaries, it should be said that permanent insanity, which causes, in whole or in part, permanent disability, should operate to excuse the insured from giving the required notice. The very object and purpose of the policy, in a large part, would be defeated where the company inserted in the policy a condition which it knew that the insured could not perform in person and would not be in a state of mind to obtain its performance at the hands of others. There is nothing in the terms of the policy from which it might be said that it was the duty of the beneficiary to give the notice.''

This case cites other cases in point to this same effect, and we now hold again, in line with this and other decisions of this court, that insanity obviates the necessity of complying with the conditions subsequent in the policy, such as giving notice of a total and permanent disability. Moreover, the chancellor was justified in holding that the notice given by the sister of the insured, together with the statements of the physicians, was sufficient notice, and, if the company had required a particular form of proof of loss, it should have so advised the appellee, or his sister, of this fact.

It is finally insisted that the court erred in allowing a $250 attorney's fee, since there was a recovery of only $200, plus the penalty in this case, and because the

statute, § 6155, C. & M. Digest, has no application in the defense of a suit brought to cancel the policy. This is something more than the defense of the action to cancel the policy. There is a cross-complaint seeking affirmative relief under the terms of the policy, and appellees have recovered the full amount sought to be recovered on the cross-complaint. The same procedure was resorted to in the case of *Bankers' Reserve Life* v. *Crowley, supra,* as here, being a suit in chancery to cancel the policy, and it was there held that the 12 per cent. allowed by the statute is recoverable as damages against the company for failure to comply with the contract by making payment, and that the attorney's fee is allowed as compensation for the cost of collecting the debt, and that it may be collected in a chancery case as well as at law. We therefore hold that the statute is applicable in this case.

On the question of the reasonableness of the fee, we are of the opinion that the fee is not excessive, although only one installment on each of the policies, which was due and payable at the time of the suit, could be collected. The determination of this question determined also the liability of the company for future installments under this policy, and the liability on the policy for the face value thereof in case of death, without change of health. Therefore it cannot be said that only $200 was involved in the action. In *Smith* v. *Adams,* 130 U. S. 167, 9 S. Ct. 566, 32 L. ed. 895, the Supreme Court of the United States used this language:

"By matter in dispute is meant the subject of litigation, the matter upon which the action is brought and issue is joined, and in relation to which, if the issue be one of fact, testimony is taken. It is conceded that the pecuniary value of the matter in dispute may be determined, not only by the judgment prayed, where such is the case, but in some cases by the increased or diminished value of the property directly affected by the relief prayed, or by the pecuniary result to one of the parties immediately from the judgment."

The case of *New York Life Ins. Co.* v. *English,* 96 Tex. 268, 72 S. W. 58, was a suit on a life insurance policy which called for the payment of the insurance in ten annual installments, commencing with the death of the insured. The insurance company failed to make payment, suit was brought to recover the first installment when due, and, while the court held that a recovery could not be had for the whole amount of the insurance, with execution to issue for the various installments as they fell due, yet it was held that "the liability of the insurance company, so far as put in issue by the pleadings, would have been determined as to the whole policy if the suit had been instituted for one installment only."

We are therefore of the opinion that the fee allowed was not excessive, and the judgment is accordingly affirmed.