LYLE v. RELIANCE LIFE INSURANCE COMPANY OF PITTSBURG, PA.

4-5368                                    124 S. W. 2d. 958

Opinion delivered February 13, 1939.

738

M. *Danaher* and *Palmer Danaher*, for appellant.

*Coleman & Gantt*, for appellee.

GRIFFIN SMITH, C. J. Appellant sued on a policy of insurance which entitled him to $25 per week if stated conditions concurred. Coverage was against loss "resulting directly and independently of any and all other causes from sickness or diseases . . . which sickness or disease shall wholly disable the insured and necessitate treatment by a legally qualified physician."

It was alleged that the plaintiff was totally disabled for nine days from March 20, 1936. Also, that he was "not necessarily confined to his home, but was totally disabled and prevented from performing many substantial duties pertaining to his occupation from March 29, 1936, for a period of 50 weeks and five days."

The court directed a verdict for $32.14, upon which judgment was rendered. This amount had been tendered by the insurance company before suit. The direction precluded recovery for the 50 weeks and five days.

Testimony of Dr. Cunningham was that Lyle came to him in February, 1936; that he had nephritis, with

blood pressure from 170 to 200,[1] and "at the beginning the patient suffered quite a lot from rheumatism." Lyle was advised to have his teeth extracted, which he did. Sometimes the suffering from rheumatism was severe; at other times the pain was not so great. Lyle was told to stay in bed several hours during each day. This the patient did for a while, but finally broke the rule. It was Dr. Cunningham's opinion that Lyle's acts in working every day, without taking the prescribed rest, were detrimental to his health.

Appellant testified that following confinement to his bed from March 20 to 29, his condition for a year was such that he was not able to work . . . "but I had to work, except at times I was out and could not work at all."[2]

On cross-examination appellant testified that for ten years he had been a grocery salesman, going from town to town seeing customers. He said: "I am working on a salary of $275 a month and furnish my own car and expenses . . . I am doing part of the same work I did before my sickness, but not all of it. The territory has been cut a little—some few accounts have been cut off of my territory. I go to Jefferson, Lincoln, and Desha counties, and worked Lonoke county near England for

---

[1] Plaintiff's age was 45 years; his weight, 203 pounds; his height, six feet. Prior to the sickness complained of, plaintiff's weight had been 260 pounds.

[2] In detail, appellant testified: "There was never a time I didn't have pain somewhere about my body—and it is still that way now. My back hurts and my neck hurts all the time. I didn't feel like working. I was nervous and just couldn't—just did not feel like working like our men worked. . . . I did the best I could to rest three hours a day as instructed by the doctor. I wouldn't leave home until late in the morning and get back early in the afternoon and lie down and rest. I still do that a part of the time, but I am just not in position to rest every day like I should, because I have so much work to do in order to get my pay; I just have to do it, whether I feel like it or not. . . . At one time Dr. Cunningham told me to go to Memphis and go through the clinic, and I went there and stayed two or three days. I also went to Hot Springs and consulted Dr. Wade. . . . I still take medicine all the time. . . . Dr. Wade told me the only thing in the world that would do me any good was to rest and stay on a diet. I have stayed on that diet pretty well. . . ."

a while. The change in my work is that I do not go to Lonoke county, and there are some of the accounts in my other territory that I do not call on any more. I leave home around eight o'clock in the morning or a little after and go down to Cook & Sons' [place of business] and get instructions about prices. I travel my territory alone. I usually call on three or four little towns a day and get home about five or six o'clock. It is the same line of work I did before March, 1936. My disease has disabled me from performing my work as I should."

"Q. Has your work for Cook & Sons during this period been satisfactory to them? A. I have an idea it has."

Two decisions of this court[3] are relied upon by appellant as authority for reversal of the directed verdict. We do not think the facts in those cases and in the instant case are similar. In the Aetna Case the plaintiff Martin was afflicted with diabetes. He was a contractor, and prior to the illness complained of . . . "had performed not only supervision and direction of his contracting work, but had made a regular hand in the execution of his business, working from 12 to 15 hours daily." Subsequent to contracting diabetes . . . "he was able to give but little attention to his business." It was further shown that Martin's business, due to neglect occasioned by his illness, had greatly depreciated in value.

Testimony in the Sams Case was that the plaintiff was suffering from a dilated heart, arterio-sclerosis, and other maladies. A physician testified: "A man in Sam's condition can't meet work that requires labor of any kind." A neighbor testified: "I never saw Sams [who was a farmer] at work on his farm; he would just be out looking around."[4]

---

[3] *Aetna Life Insurance Company* v. *Martin,* 192 Ark. 860, 96 S. W. 2d 327; *The Sovereign Camp W. O. W.* v. *Sams,* 194 Ark. 557, 108 S. W. 2d 1089.

[4] Other testimony on behalf of the appellee Sams was: "He should not do any work requiring the least exertion."—Dr. McCollum. "He can't hold out to do anything very long. At times he was helping haul hay, and while I was pitching it to him he would give out. Would haul a load of hay and the next day he would help me plow

In *Aetna Life Insurance Co.* v. *Person,* 188 Ark. 864, 67 S. W. 2d 1007, we said: "The general object of contracts similar to that involved in this case is to give to the insured indemnity for the loss of time because of a disability which prevents the prosecution of his business, and the evident purpose is to provide a means of living during the time the insured is unable to engage in any gainful occupation. As we have stated, disability exists within the meaning of the contract when the assured is able to accomplish only some of the duties essential to the prosecution of his business, and where he is able to perform only occasional acts."

The question is, Was appellant wholly disabled? We do not find any evidence to show that he was. By his own admissions he continued to work, and he drew the same salary throughout the period of so-called disability. It is not in the record that his employers complained. On the contrary, appellant "had an idea" they were satisfied with his services.

The word "disability" is synonymous with incapacity. As used in the workmen's compensation statutes of most of the states, disability means loss of earning power.[5]

The evidence shows that appellant's work was attended by physical inconvenience, considerable danger of aggravating the condition, and that there was physical pain in connection with the rheumatism of which he complained. Yet, the fact remains that he continued to work and that his earning power was not decreased. In these circumstances the trial judge did not err in instructing a verdict.

Affirmed.

---

and would have to quit before night because he gave out. He has been in bed practically ever since. He has tried to help on the farm within the last thirty days, but he can't hold out."—J. E. Freeman.

[5] Ballentine's Law Dictionary, p. 378; 28 R. C. L. 819.